IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AARON ARCHY, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 16-467-RGA |
| CONNECTIONS CSP, INC., | : | |
| Defendant. | : | |

Aaron Archy, James T. Vaughn Correctional Center, Smyrna, Delaware; Pro Se Plaintiff.

Dana Spring Monzo, Esquire, and Roopa Sabesan, Esquire, White & Williams, Wilmington, Delaware, Counsel for Defendant.

**MEMORANDUM OPINION**

July 25, 2019
Wilmington, Delaware

ANDREWS, U.S. District Judge:

Plaintiff Aaron Archy, an inmate at the James T. Vaughn Correctional Center, filed this action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and has been granted leave to proceed in *forma pauperis*. The parties have filed cross-motions for summary judgment. (D.I. 51, 63). Briefing is complete

## BACKGROUND

Connections became the medical service contract provider for the Delaware Department of Correction on June 1, 2014, replacing the former medical service contract provider Correct Care Solutions, whose contract was set to expire on June 30, 2014.[1] (D.I. 64 at 30-31, 45-46). It appears there was a one-month transition period. According to Defendant, during the transition and until the end of June 2014, Correct Care Solutions continued to provide medical care to inmates at Delaware Department of Correction prisons. (D.I. 63 at 2, n.1).

Plaintiff was injured on June 11, 2014, either during a fight with another inmate or from punching a wall. (D.I. 4 at ¶ 9; D.I. 53 at 5; D.I. 64 at 9). Plaintiff submitted a sick call slip that day and requested treatment for a broken knuckle. (D.I. 53 at 5; D.I. 64 at 9). Plaintiff was seen the next day by a nurse practitioner, who examined Plaintiff's right knuckles, noted moderate swelling and bruising, prescribed Motrin for ten days, and placed a request to schedule Plaintiff for a follow up evaluation by a provider. (D.I. 53 at 5, 7; D.I. 64 at 9). Plaintiff rated his pain level at six out of ten. (D.I. 53 at 5; D.I. 64 at 9).

---

[1] Correct Care Solutions is not a named defendant.

1

The next morning, the pain had worsened and the hand was badly swollen. (D.I. 4 ¶ 2). On June 25, 2014, Plaintiff submitted another sick call slip and asked for an x-ray of his right hand. (D.I. 53 at 6; D.I. 64 at 8). He was seen on June 27, 2014, and medical staff observed that Plaintiff's right hand was swollen, and he had a limited range of motion. (*Id.*). Plaintiff rated his pain at four out of ten. (*Id.*). Medical staff prescribed Motrin and ordered an x-ray of the right hand. (D.I. 53 at 6-7; D.I. 64 at 5, 8). (*Id.*). The x-ray request is on a Correct Care Solutions form. (D.I. 53 at 9).

On July 22, 2014, Plaintiff submitted another sick call slip for medical attention and an x-ray. (D.I. 53 at 11; D.I. 64 at 7). The x-ray was scheduled and took place on July 25, 2014. (D.I. 53 at 10, 11, 13, 206; D.I. 64 at 7, 69). The x-ray revealed a fracture of the right fourth metacarpal with slight displacement. (D.I. 53 at 20). Written on the x-ray report is "schedule to see provider (indecipherable initials) 8/21/14." (*Id.*). Plaintiff submitted a sick call slip on August 19, 2014, to review the x-ray results and further medical care. (D.I. 53 at 12, 14; D.I. 64 at 6). On August 21, 2014, Plaintiff was seen by medical staff who contacted the provider to schedule an x-ray review. (D.I. 53 at 21; D.I. 64 at 6).

On September 6, 2014, Plaintiff submitted a medical grievance and asked to see a physician, requested the x-ray results, and complained that his knuckle was disfigured. (D.I. 64 at 64). The grievance investigation found that Dr. Louise DesRosiers had reviewed the x-ray results on August 21, 2014 and ordered that Plaintiff be seen by an outside medical provider. (D.I. 4 at 9). Nurse Practitioner Bernard Addogoh was made aware of this on September 26, 2014, and ordered a repeat x-ray

2

of the right hand. (D.I. 4 at 9; D.I. 53 at 19, 21). Medical notes indicate that because the July 25, 2014 x-ray was two months old, a repeat x-ray would be scheduled. (D.I. 53 at 23, D.I. 64 at 16). At the same time, Plaintiff was scheduled to see a provider on September 30, 2014. (D.I. 53 at 21). The charge nurse noted that Plaintiff "still has not been seen." (D.I. 53 at 23; D.I. 64 at 16).

The repeat x-ray was taken on September 29, 2014. (D.I. 53 at 23, D.I. 64 at 16). It showed an angulated fracture of the fourth metacarpal with moderate to complete healing. (D.I. 53 at 17, D.I. 64 at 16). Dr. DesRosiers was unable to see Plaintiff on September 29, 2014, and rescheduled him. (D.I. 53 at 23; D.I. 64 at 16). Plaintiff was seen by Dr. DesRosiers on October 7, 2014. (*Id.*). At that time, Plaintiff indicated that he no longer had pain and could use the hand almost normally. (*Id.*). He was able to do push ups but stopped upon a nurse's advice. (*Id.*). Examination revealed normal range of movement, normal fist, normal extension but instability at metacarpal/phalangeal joint. (*Id.*) Dr. DesRosiers made an assessment of healed angulated fracture of the right fourth metacarpal and metacarpal/phalangeal joint instability. (*Id.*). She scheduled Plaintiff for a follow up consult with board certified orthopedic surgeon Dr. Richard DuShuttle. (D.I. 53 at 23; D.I. 64 at 4, 16, 70).

Plaintiff was seen by Dr. DuShuttle on October 16, 2014. (*Id.* D.I. 53 at 26; D.I. 64 3, 15). Plaintiff presented with complaints of pain, instability, stiffness and decreased range of motion. (*Id.*). Plaintiff complained of symptoms that occur constantly, are severe and unchanged, and described the pain as sharp and dull, but not radiating. (*Id.*).

3

Dr. DuShuttle's review of the x-ray found that the fracture had healed. (*Id.* at 3). His examination of the right hand found a full range of motion, good grip strength, sensation of finger intact, positive active dip (*i.e.*, distal interphalangeal joint) motion fourth finger, positive active pip (*i.e.*, proximal interphalangeal) motion fourth finger, and positive full ringer range of motion. (*Id.*). In addition, examination of the right hand indicated it was negative for: trigger finger, locking finger, dorsal redness, palmar redness, locking fourth finger, extension lag pip joint further finger, pain fourth finger, finger sensation deficit, deformity fourth finger, and swelling of the fourth finger. (*Id.*). Dr. DuShuttle determined that no medication or further care was needed. (*Id.*).

Connections Chief Medical Officer Dr. Christopher Moen reviewed Plaintiff's medical records. (*Id.* at 69). Based upon his review, he determined that Plaintiff sustained no permanent injuries to his hand. (*Id.* at 70). He stated that that "it is consistent with the standard of care for Dr. DesRosiers to refer Plaintiff to an orthopaedic specialist, such as Dr. DuShuttle, and rely upon his expertise and evaluation of Plaintiff." (*Id.* at 70).

Plaintiff moves for summary judgment on the grounds that: (1) Connections' conduct in responding to Plaintiff's serious medical needs constituted a policy, custom, or practice; and (2) Connections has a regular practice of being deliberately indifferent to the JTVCC inmate population's serious medical needs. (D.I. 52). Defendant moves for summary judgment on the grounds that Plaintiff failed to produce any evidence to show that he sustained any permanent injuries or that Connections caused injury by maintaining a deficient policy or custom. (D.I. 63).

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986).

## DISCUSSION

Plaintiff argues he had a serious medical need, and there was a four month delay in denying him access to medical care. His claim appears to rest upon the fact that he was not seen by a "provider" (*i.e.*, a physician) until October 7, 2014, some four months after he was injured on June 11, 2014. Plaintiff argues that his injury did not receive proper medical attention as it was never set back to its proper placement and healed out of its proper alignment. Plaintiff argues that Defendant has a regular practice of deliberate indifference to the JTVCC inmate population's serious medical needs. He relies upon several cases filed by inmates within the DOC whose complaints survived the screening process and proceeded to the service stage. Plaintiff takes the same position in opposing Defendant's motion for summary judgment.

5

Defendant opposes Plaintiff's motion and moves for summary judgment arguing that Plaintiff provides no evidence to show that, despite actual knowledge of an unreasonable risk of harm, it maintained a constitutionally defective policy or custom. It notes that Plaintiff points to nothing in the record to support his claim that his hand is permanently disfigured, and that he did not provide any evidence to show that Connections was actually aware of an unreasonable risk of harm posed by its policies and failed to take corrective action.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). However, in order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05.

"[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). "A prisoner does not have the right to choose a specific form of medical treatment." *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-40 (2d Cir. 2000)). An inmate's claims against members of a prison medical

6

department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble*, 429 U.S. at 107.

In addition, a prisoner bringing a medical needs claim "must show more than negligence; he must show 'deliberate indifference' to a serious medical need." *Durmer v. O'Carroll*, 991 F.2d at 67. "Allegations of medical malpractice are not sufficient to establish a Constitutional violation . . . [Nor is] [m]ere disagreement as to the proper medical treatment." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). A "failure to provide adequate care . . . [that] was deliberate, and motivated by non medical factors" is actionable under the Eighth Amendment, but "inadequate care [that] was a result of an error in medical judgment" is not. *Durmer*, 991 F.2d at 69. Courts have found "'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d at 197.

When a plaintiff relies upon a theory of respondeat superior to hold a corporation liable, as in this case, he must allege a policy or custom that demonstrates such deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992)  Plaintiff's

7

allegations are that he did not receive a timely x-ray and did not see a physician until four months after his injury.

The Court finds that no reasonable jury could find for Plaintiff in this matter. The evidence of record, which includes medical records, statements by Plaintiff, and grievances, indicate that Plaintiff received ongoing medical care following the June 11, 2014 injury. While Plaintiff did not see a physician for four months until after he was injured, the record reflects that he was seen by nurses many times during that time-frame. When Plaintiff submitted a sick call slip, he was typically seen by a nurse within a few days. Any delays in his treatment simply do not rise to the level of deliberate indifference to a serious medical need.

Nor does Plaintiff point to a course of conduct, custom or policy with regard to inmates being x-rayed or being seen by physicians. The first x-ray was not requested until June 27, 2014, a little over two weeks following Plaintiff's injury. However, at that time, Correct Care Solutions continued to provide medical care to DOC inmates as evidenced by the Correct Care Solutions x-ray request form. The medical records indicate that once Connections began providing medical care, Plaintiff was seen by medical personnel (not necessarily a physician) in July, August, September, and October. Connections scheduled the second x-ray to take place on September 29, 2014, and, thereafter, Plaintiff was seen by an outside orthopedic surgeon.

Plaintiff refers to a number of cases that all purportedly stand for the proposition that on numerous occasions Connections has intentionally delayed or denied medical

care to inmates.[2] In the instant case, however, the evidence of record does not indicate that Connections or any of its employees intentionally delayed or denied medical care. Plaintiff was provided on-going medical care, he underwent medical testing, and he was seen by an outside specialist for his condition. Given the care provided Plaintiff, there was no violation of Plaintiff's constitutional rights, which, by itself, means that Connections cannot be liable based on the theory that it established or maintained an unconstitutional policy or custom responsible for violating Plaintiff's rights. *See Goodrich v. Clinton Cty. Prison*, 214 F. App'x 105, 113 (3d Cir. 2007).

Accordingly, the Court will deny Plaintiff's motion for summary judgment and will grant Defendant's motion for summary judgment.

## CONCLUSION

Based upon the above discussion, the Court will: (1) deny Plaintiff's motion for summary judgment; and (2) grant Defendant's for summary judgment.

An appropriate order will be entered .

---

[2] Generally-speaking, what the cited cases (D.I. 52 at 3-4) refer to are allegations of delay or denial of medical care, not any actual findings of delay or denial of medical care done with deliberate indifference. The pleading stage requires allegations, and generally involves no review of any actual medical records. Other inmates making generally similar allegations does not constitute evidence.